## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CONSTANCE JACKSON and GWEN KASZYNSKI, individually and on behalf of all others similarly situated,<br><br>                     Plaintiffs,<br><br>    v.<br><br>SCHELL & KAMPETER, INC. d/b/a DIAMOND PET FOODS, and DIAMOND PET FOODS INC.,<br><br>                     Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Constance Jackson ("Jackson") and Gwen Kaszynski ("Kaszynski") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, as and for this Class Action Complaint against defendants Schell & Kampeter, Inc. d/b/a Diamond Pet Foods and Diamond Pet Foods Inc. (collectively "Defendants"), for their negligent, reckless, and/or intentional practice of misrepresenting, failing to test for, and failing to fully disclose the risk and/or presence of heavy metals, toxins, Bisphenol A ("BPA"), and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements of products sold throughout the United States. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Class (defined below), including requiring full disclosure of all heavy metals, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels in its marketing, advertising, and labeling; requiring testing of all ingredients and final products for heavy metals, toxins, BPA, and/or unnatural ingredients ; and restoring monies to the members of the proposed Class.

Plaintiffs allege the following based upon personal knowledge and their own actions, and, as to all other matters, respectfully alleges, upon information and belief, as follows (Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery).

## NATURE OF THE ACTION

1.      Aware of the health risks and environmental damage caused by processed and chemical-laden foods, consumers increasingly demand foods for themselves and for their pets that possess high quality ingredients and are free of contaminants, toxins, chemicals and/or other unnatural ingredients.

2.      Defendants know that certain consumers seek out and wish to purchase premium pet foods that possess high quality ingredients and do not contain chemicals, toxins contaminants chemicals and other unnatural ingredients, and that these consumers will pay more for pet foods that they believe possess these qualities than for pet foods that they do not believe possess these qualities.

3.      As such, Defendants' promises, warranties, pricing, statements, claims, packaging, labeling, marketing, and advertising (hereinafter collectively referred to as "Marketing" or "Claims") center on representations and pictures that are intended to, and do, convey to consumers that their pet food (the "Products"), including their Contaminated Dog Foods,[1] possess certain qualities and characteristics that justify a premium price.

4.      However, Defendants' Marketing is deceptive, misleading, unfair, and/or false because, among other things, the Contaminated Dog Foods include undisclosed Heavy Metals,[2]

---

[1] The Contaminated Dog Foods collectively refer to: Taste of the Wild® Grain Free High Prairie Canine Formula Roasted Bison and Roasted Venison Dry Dog Food; Taste of the Wild® Grain Free Pacific Stream Canine Formula Smoked Salmon Dry Dog Food; Taste of the Wild® Prairie Puppy Formula Grain-Free; Taste of the Wild Southwest Canyon with Beef in Gravy; and Taste of the Wild Southwest Canyon with Wild Boar.

[2] Arsenic, lead, mercury, and cadmium are defined collectively herein as "Heavy Metals."

pesticides, acrylamide, bisphenol A ("BPA") and/or unnatural or other ingredients that do not conform to the labels.

5.      Defendants' Contaminated Dog Foods do not have a disclaimer regarding the presence of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels or that these toxins can accumulate over time in the dog's body to the point where poisoning, injury, and/or disease can occur.

6.      Consumers lack the scientific knowledge necessary to determine whether the Products do in fact contain Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels and to know or to ascertain the true ingredients and quality of the Products.

7.      No reasonable consumer seeing Defendants' Marketing would expect that the Products contain Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

8.      Reasonable consumers must and do rely on Defendants to disclose what the Contaminated Dog Foods actually contain or if there is a known risk of inclusion of an undesirable ingredient.

9.      Further, reasonable consumers, like Plaintiffs, would consider the mere inclusion (or risk of) of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels in the Contaminated Dog Foods a material fact when considering what pet food to purchase.

10.     Defendants knew or should have been aware that a consumer would be feeding the Contaminated Dog Foods to his or her dog multiple times each day, making it the main, if not only, source of food.  This leads to repeated exposure of the Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels to the family's pet.

11.     Defendants intended for consumers to rely on their Marketing, and reasonable consumers did in fact so rely.

12.     Consequently, Defendants continue to wrongfully induce consumers to purchase their Contaminated Dog Foods that are not as advertised.

13.     Defendants' wrongful Marketing, which includes misleading, deceptive, unfair, and false Marketing and omissions, allowed it to capitalize on, and reap enormous profits from, consumers who paid the purchase price or a premium for the Products that were not sold as advertised.

14.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Classes (as defined herein), who, from the applicable limitations period up to and including the present, purchased for use and not resale any of Defendants' Contaminated Dog Foods.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332 (a) and (d), because the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and more than two-thirds of the members of the proposed class (hereinafter "Class") are citizens of states different from that of Defendants.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants' improper conduct alleged in this Complaint caused injury in this judicial district.

## THE PARTIES

17.     Plaintiff Jackson is, and at all times relevant hereto has been, a citizen of the state of Illinois.  Plaintiff Jackson purchased the Contaminated Dog Food line of Taste of the Wild® Grain Free Pacific Stream Canine Formula Smoked Salmon Dry Dog Food, Taste of the Wild® Southwest Canyon Grain-Free Dry Dog Food With Wild Boar, Taste of the Wild® Southwest Canyon Canine Formula With Beef in Gravy Grain-Free Canned Dog Food, and other Contaminated Foods, from Chewy.com between 2017 and 2018 for her ten year Yellow Labrador Retriever, Casey; her five year Irish Setter, Shauna; her five year Whippet/Border Collie Mix, Daisy; and her seven year Great Pyrnees/Lab Mix, Matthew.  She typically

purchased 30-lb bags of food and paid approximately $50 per bag. Prior to purchasing the Contaminated Dog Foods, Plaintiff Jackson saw the nutritional claims and labels on the packaging and on the Chewy.com website, which she relied on in deciding to purchase the Contaminated Dog Foods. During the time Jackson purchased and fed the Contaminated Dog Foods, due to the false and misleading claims, warranties, representations, advertisements and other marketing by Defendants, Plaintiff Jackson was unaware that the Contaminated Dog Foods contained any level of heavy metals, BPA, pesticides, or acrylamide, and would not have purchased the food if that was fully disclosed.

18.     As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff Jackson was injured when she paid the purchase price and/or a price premium for the Contaminated Dog Foods that did not deliver what Defendants promised. Plaintiff Jackson paid the above sum in reliance that the labeling of the Contaminated Dog Foods was accurate, that there were no material omissions, and that it was healthy, clean, composed of superior ingredients that offer the "best nutrition available today" as "nature intended", as well as natural and pure. Plaintiff Jackson would not have purchased the Contaminated Dog Foods had she known it contained Heavy Metals, BPA, pesticides, or acrylamide. Damages can be calculated through expert testimony at trial. Further, should Plaintiff Jackson encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

19.     Plaintiff Kaszynski is, and at all times relevant hereto has been, a citizen of the state of Illinois. Plaintiff Kaszynski purchased the Contaminated Dog Food line of Taste of the Wild® Grain Free High Prairie Canine Formula Roasted Bison and Roasted Venison Dry Dog Food, Taste of the Wild® Grain Free Pacific Stream Canine Formula Smoked Salmon Dry Dog Food, and other Contaminated Foods, locally from Woodstock Farm & Lawn in approximately 2018 for her seven year Great Dane, Hope and her eleven year Golden Retriever, Ricky Bobby. She typically purchased 30-lb bags of food and paid approximately $50 per bag. Prior to

purchasing the Contaminated Dog Foods, Plaintiff Kaszynski saw the nutritional claims and labels on the packaging and on the Amazon.com website, which she relied on in deciding to purchase the Contaminated Dog Foods.  Plaintiff Kaszynski believed she was feeding her dogs a premium dog food that was healthy and nutritious.  During the time Kaszynski purchased and fed the Contaminated Dog Foods, due to the false and misleading claims, warranties, representations, advertisements and other marketing by Defendants, Plaintiff Kaszynski was unaware that the Contaminated Dog Foods contained any level of heavy metals, BPA, pesticides, or acrylamide, and would not have purchased the food if that was fully disclosed.

20.     As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff Kaszynski was injured when she paid the purchase price and/or a price premium for the Contaminated Dog Foods that did not deliver what Defendants promised.  Plaintiff Kaszynski paid the above sum in reliance that the labeling of the Contaminated Dog Foods was accurate, that there were no material omissions, and that it was healthy, clean, composed of superior ingredients that offer the "best nutrition available today" as "nature intended", as well as natural and pure.  Plaintiff Kaszynski would not have purchased the Contaminated Dog Foods had she known it contained Heavy Metals, BPA, pesticides, or acrylamide.  Damages can be calculated through expert testimony at trial.  Further, should Plaintiff Kaszynski encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

21.     Defendant Schell & Kampeter, Inc. d/b/a Diamond Pet Foods is incorporated in Missouri with its headquarters located at 103 North Olive Street, Meta, Missouri.

22.     Defendant Diamond Pet Foods Inc. is a wholly owned subsidiary of Defendant Schell & Kampeter, Inc. d/b/a Diamond Pet Foods and is also headquartered at 103 North Olive Street, Meta, Missouri.

23.     Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell the Contaminated Dog Foods under the Taste of the Wild® brand name throughout the

United States, including Illinois. The advertising, labeling, and packaging for the Contaminated Dog Foods, relied upon by Plaintiffs, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging and labeling for the Contaminated Dog Foods was designed to encourage consumers to purchase the Contaminated Dog Foods and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing the Contaminated Dog Foods. Defendants own, manufacture, and distribute the Contaminated Dog Foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Dog Foods.

24. The Contaminated Dog Foods at a minimum, include: [3]

(a) Taste of the Wild® Grain Free Southwest Canyon Canine Recipe with Wild Boar Dry Dog Food:



---

[3] Discovery may reveal additional Products that also contain levels of Heavy Metals, pesticides, acrylamide, or BPA and Plaintiff reserves his right to include any such Products in this action.

(b)     Taste of the Wild® Grain Free Southwest Canyon Canine Formula with Beef in Gravy Wet Dog Food:



(c)     Taste of the Wild® Grain Free High Prairie Canine Formula Roasted Bison and Roasted Venison Dry Dog Food:



(d)  Taste of the Wild® Prairie Puppy Formula Grain-Free:



(e)  Taste of the Wild® Grain Free Pacific Stream Canine Formula Smoked Salmon Dry Dog Food:



## FACTUAL ALLEGATIONS

**I.  Defendants' Marketing of Their Contaminated Dog Foods**

25.  Defendants' package, label, market, advertise, formulate, manufacture, distribute, and sell their Contaminated Dog Foods throughout the United States, including Illinois.

26.     As stated by Defendants, they are "one of the fastest growing pet food manufacturers in the country." The Contaminated Dog Foods are available at numerous retail and online outlets and are widely advertised.

27.     Defendants' Marketing represents that that their "premium" dog food is made of "the highest quality ingredients and products" for "nutrition-conscious pet owners."

28.     Defendants' business model is premised upon the purported belief that "every pet, from purebred show animal to shelter puppy or kitten, is worthy of the best nutrition."

29.     Defendants state that they "strive to provide honest and accurate information about the ingredients used in Taste of the Wild formulas."

30.     Defendants also repeatedly tout that the Contaminated Dog Foods are natural in that they are as "nature intended."

31.     As shown below, Defendants explain on their website (all while depicting animals in the wild), the brand name of the Contaminated Dog Foods (Taste of the Wild®) is meant to reflect and imply that the Products are natural, akin to what "nature intended" pets to eat in the "Wild," and are formulated "based on your pet's ancestral diet":



32.     Moreover, the Contaminated Dog Foods packaging depicts the same misrepresentations, displays images of wild animals in natural settings, and emphasizes the Products' makeup as being akin to that found in nature and "the Wild":

 

High Prairie Canine® Formula
with Roasted Bison & Roasted Venison
A GRAIN-FREE DIET

The balanced diet that nature intended*

Modern science proves that your dog shares the DNA of the wolf. Years of domestication and excellent care have turned your dog from a short-lived potential foe to a long-lived best friend. Although his DNA remains the same and his tastes demand something of the wild, his diet should provide him with all the best nutrition available today.

33.     Additionally, the packaging describes the ingredients in the Contaminated Dog Foods as "processed under strict human-grade standards to ensure purity," providing "optimal

health and vitality," supporting "optimal cellular health" and "overall good health," and helpful in maintaining "the sleek condition of good health":



**Species-Specific Probiotics** – Healthy digestive and immune systems are vital to the overall health of your pet. K9 Strain® Probiotics are developed specifically for dogs and processed under strict human-grade standards to ensure purity. Each cup of Taste of the Wild provides live, active cultures that help support healthy digestion and help your dog maintain an active lifestyle.



**No Grain** – This grain-free formula provides your dog with nutrition for optimal health and vitality.



**Antioxidants** – Antioxidants help protect your dog's overall good health. Vegetables and fruits provide antioxidants, and guaranteed levels of zinc, vitamin E and selenium help support optimal cellular health.



**Omega Fatty Acid Blend** – Omega-6 and omega-3 fatty acids work together to help maintain healthy skin and a shiny coat as well as overall good health.



34.     Defendants' packaging and advertising also touts its food as "natural" and as providing "the best nutrition available today":



35.     Taste of the Wild's motto is "Taste of the Wild Pet Food: Based on your Pet's Ancestral Diet":

**Taste of the Wild Pet Food: Based on your Pet's Ancestral Diet**
https://www.tasteofthewildpetfood.com/ ▾
Modern science proves that your dog or cat still shares the DNA of the ancient canine or wild feline. Although their tastes demand something of the wild, your pet's diet should provide them with all the best nutrition available today. And that is precisely what they get with **Taste of the Wild**: premium, complete, grain-free pet ...
Taste of the Wild - Taste of the ... · Our Company · Prey · Contact

36.     The foregoing Marketing reveals the great lengths Defendants have undertaken to portray their Contaminated Dog Foods as possessing certain qualities and characteristics concerning their composition and quality.

37.    The packaging and advertising of the Contaminated Dog Foods does not disclose that they contain any level of Heavy Metals, BPA, pesticides, or acrylamide:



## II.    Defendants' Testing of Their Contaminated Dog Foods

38.    Defendants' Marketing also prominently emphasizes their rigorous testing of their Products.

39.    For example, Defendants state:

> We understand that it matters what you feed your pet, which is why we work to ensure that all of our formulas are produced to adhere to strict quality and safety standards.  As such, we maintain close relationships with our suppliers to continually test our ingredients, production environment, production process and finished products to ensure quality and safety.  By implementing the latest scientific and technological advancements, we have developed a comprehensive food safety system that ensures your pet's food is always safe and nutritious.

40.    Defendants also provide:

> Stringent Purification
>
> Processed under strict quality and safety standards, our K9 Strain and Viables probiotics are guaranteed to be free of harmful pathogens or other contaminants.

41.    Defendants further assure that food safety is a top priority and that they are dedicated to quality assurance:

> Do you have a food safety program?
>
> Absolutely! Food safety is our top priority, which is why our facilities adhere to stringent quality protocols, have a dedicated quality assurance and safety staff and follow "Good Manufacturing Processes" protocols. To learn more about our food safety program, you can visit our website at

https://diamondpetcompany.com/how-we-ensure-every-pet-is-getting-the-very-best/nutritional-integrity/.

\* \* \*

At Taste of the Wild, we believe every pet deserves excellent nutrition that tastes great. Every ingredient is carefully selected from trusted sources, each recipe is designed by our veterinarians and nutritionists to meet specific nutritional requirements and every product is tested for quality and safety before leaving our facilities.

42. To this end, the Marketing contained on Defendants' website further states that their Products, including Taste of the Wild®, are manufactured and sourced in such a way that would prevent any contamination by Heavy Metals, pesticides, acrylamide, and/or BPA:

NUTRITIONAL *INTEGRITY*

THE *HIGHEST QUALITY* INGREDIENTS

When we made the conscious decision to only make pet food you'd be proud to feed your own pet, *we didn't skimp on quality*. That's why *we source the finest ingredients* and establish solid relationships with our trusted suppliers to *ensure we're always getting the very best*. All of our formulas are unique, based on your pet's needs and life stage, but here are just a few of the quality ingredients you'll find in our products.

Real chicken, lamb, salmon, turkey, fowl, bison and venison Vegetables like carrots, peas, sweet potatoes and spinach Fruits like apples, blueberries and cranberries Whole grains such as brown rice, barley and oatmeal Prebiotics and probiotics for healthier digestion.

SUPPLIER MANAGEMENT PROGRAM

*Our ingredients suppliers are approved through a rigorous process intended to validate commitments to food safety and ingredient quality*, and also to ensure financial viability. Our method is to work with fewer suppliers under longer-term arrangements, rather than engage with a host of suppliers participating in a continual bid process. This approach fosters trust, collaboration and continual improvement, and works to encourage vendor-partners to make investments in quality control, food safety training and laboratory testing equipment.

SCIENTIFIC FORMULATIONS

Our pet food formulas are based on the latest animal nutrition research and are carefully designed to meet your pet's specific life stage. No matter which formula you choose, ***you can rest assured you're getting the very best nutrition for a long and healthy life***.

**III.    Defendants Misled Consumers Through Their Deceptive, Misleading, Unfair, and False Marketing and Omissions**

43.      The Defendants' Marketing wrongfully conveys to consumers that Defendants' Contaminated Dog Foods have certain superior qualities and characteristics that they do not actually possess.

44.      For instance, although Defendants misleadingly lead consumers to believe their Contaminated Dog Foods do not contain Heavy Metals, pesticides, acrylamide, or BPA through their Marketing and omissions, Defendants' Products do in fact contain undisclosed Heavy Metals, pesticides, acrylamide, and/or BPA, which are material to reasonable consumers.

45.      For example, the specific product types purchased by Plaintiffs were tested and found to contain undisclosed Heavy Metals, pesticides, acrylamide, and/or BPA (material to a reasonable consumer) at the following levels:

| Product | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg | total pesticides ug per kg | acrylamide ug per kg |
|---|---|---|---|---|---|---|---|
| Taste of the Wild Grain Free Pacific Stream Canine Formula Smoked Salmon Dry Dog Food | 255.40 | 258.00 | 54.20 | 30.90 | 399.20 | 38.92 | 172.90 |
| Taste of the Wild Grain Free High Prairie Canine Formula Roasted Bison and Roasted Venison Dry Dog Food | 155.80 | 276.00 | 59.70 | 16.70 | 394.50 | 460.00 | 86.50 |
| Taste of the Wild® Prairie Puppy Formula Grain-Free | 161 | | 99.6 | < 9.8 | 476 | | |
| Taste of the Wild Southwest Canyon With Wild Boar | 53. 1 | | 60.2 | | 12,200 | | |
| Taste of the Wild Southwest Canyon with Beef in Gravy | | | | | 271 | | |

46.     Defendants' Marketing wrongfully fails to disclose to consumers the presence of

Heavy Metals, pesticides, acrylamide, and/or BPA in Defendants' Contaminated Dog Foods.

47.     Based on Defendants' Marketing, a reasonable consumer would not suspect the presence of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels nor would a reasonable consumer be able to detect the presence of Heavy Metals, pesticides, acrylamide, and/or BPA in the Contaminated Dog Foods without conducting his or her own scientific tests, or reviewing scientific testing conducted on the Products.

48.     Reasonable consumers must and do rely on Defendants to report honestly what the Products contain.

49.     In light of Defendants' Marketing, including their supposed stringent quality controls and assurances, Defendants knew or should have known the Contaminated Dog Foods possessed Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

50.     Defendants intended for consumers to rely on their representations, and reasonable consumers did in fact so rely.

51.     Further, the Association of American Feed Control Officials ("AAFCO") provides guidelines concerning the proper labeling and packaging of pet food.  In relevant part, AAFCO provides that all claims made for a product must be truthful and must not be misleading to the consumer.

52.     For example, AAFCO states that individual ingredients must not be over-emphasized to the exclusion of other ingredients.  AAFCO also provides that a vignette, graphic, or pictorial representation on a pet food or specialty pet food label shall not misrepresent the contents of the package.

53.     Yet, Defendants' Contaminated Dog Foods displays images of wild animals in natural settings that emphasize the Products' makeup as being akin to that found in nature and "the Wild," and have text and symbols highlighting the protein and vegetables each product contains.  On the other hand, Defendants' Contaminated Dog Foods do not disclose the presence

of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

54.     Thus, the images and Claims utilized by Defendants, in the context of the whole label or packaging of the Contaminated Dog Foods, is misleading, deceptive, and false.

55.     Defendants had a duty to ensure the Contaminated Dog Foods were as represented and not deceptively, misleadingly, unfairly, and falsely marketed.

56.     Pursuant to the foregoing, Defendants' Marketing is deceptive, misleading, unfair, and false to Plaintiffs and other consumers, including under the consumer protection laws of California.

57.     Defendants acted negligently, recklessly, unfairly, and/or intentionally with their deceptive, misleading, unfair, and false Marketing and omissions.

### IV.    The Pet Food Industry, Including Defendants, Knows that the Average Consumer Cares and Considers What He or She Is Feeding Their Pet

58.     Consumers are becoming increasingly concerned with what they feed their pets.

59.     The Pet Food industry has been reporting on the humanization of both pets and pet food for years.

60.     A recent survey done by a pet food giant showed that "95 percent [of pet owners] agreed they saw their canine as part of the family." And 73% of them responded they would make sure their "pet gets food before they do."[4]

61.     But this is nothing new, as in 2017, a survey had reported the same results: "In the US, 95% of pet owners consider their pets to be part of the family—up 7 points from 2007, according to a survey by Harris Poll."[5]

62.     Indeed, based on this, it was reported that "there isn't much people won't do for their pets, and this sentiment has only strengthened over the past few years, especially for pet

---

[4] Kelli Bender, *Study Shows Half of Women Would Rather Spend Friday Night with Their Dog than Their Partner*, People (Jul 19, 2018) https://people.com/pets/study-women-prefer-dogs-to-partner/.

[5] *Report: 95% Say Pets Are Part of the Family*, PetfoodIndustry.com (Mar. 9, 2016) https://www.petfoodindustry.com/articles/5695-report---say-pets-are-part-of-the-family.

food. Pet food accounts for 76% of the pet care category, representing a significant opportunity for pet companies."[6]

63.     And, pet owners want "pet food options that address the same health concerns currently influencing human food production, such as unnatural preservatives and genetically modified ingredients—and they're serious about these preferences."[7]

64.     "Treating pets like one of the family continues to be a popular trend among pet owners; however, today, their purchases are more and more functionally driven as health becomes a top priority."[8]

65.     Thus, consumers are willing to pay a premium for their pet food if their pet food is of superior quality.

**V.      The Mere Inclusion (or Risk Thereof)of Heavy Metals, Pesticides, Acrylamide, and/or BPA Is Material to a Reasonable Consumer Based on the Inherent and Known Risks of Consumption and/or Exposure**

66.     Whether a pet food contains Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels is material to a reasonable consumer when making purchasing decisions.

67.     Consumption and/or exposure to Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural ingredients carry known risks.

68.     For instance, based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulating by the EPA). Moreover, the FDA is considering limiting the action level for arsenic in rice cereal for infants to 100 ppb.

---

[6] *Id.*

[7] *The Humanization of Pet Food*, Nielsen.com (Mar. 2016), http://www.nielsen.com/us/en/insights/reports/2016/the-humanization-of-pet-food.html.

[8] *US Pet Food Market Report Reveals Pet Humanization Trend*, Petfoodindustry.com (Sept. 24, 2017), https://www.petfoodindustry.com/articles/6694-us-pet-food-market-report-reveals-pet-humanization-trend

69.     Additionally, drinking water with levels greater than 250 ppb is considered potentially toxic, especially to large animals.

70.     Arsenic poisoning can be caused by acute and/or repeated exposure to the toxin over a long period of time.  Arsenic toxicity can affect the gastrointestinal and cardiovascular systems, as well as lead to circulatory collapse.

71.     Lead is another carcinogen and toxin known to cause health problems.  Exposure to lead in food can build up over time and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental disorders, and affect normal cell metabolism as well as cause serious injuries to the central nervous and gastrointestinal systems.

72.     Here, one of the Contaminated Dog Foods tested higher than most homes in Flint Michigan: "In Flint, the amount of lead found in in residents' water since the crisis erupted has varied from house to house with many showing no detectable levels of lead. At a few homes, lead levels reached 4,000 ppb to nearly 12,000 ppb." Importantly, Jim Taft, executive director of the Association of State Drinking Water Administrators has stated if the water tests at the lead levels in Flint, "people need to stop drinking the water."[9]

73.     Mercury can cause damage to the kidneys and neurological, cardiovascular, and nervous systems in dogs.  Exposure to mercury can also interfere with metabolic activity, leading to tissue necrosis and degeneration. Continued exposure to mercury can also injure the inner surfaces of the digestive tract and abdominal cavity.

74.     Cadmium is extremely toxic and has toxic biological effects at concentrations smaller than almost any commonly found mineral.  Exposure to cadmium has been observed to cause anemia, liver disease, and nerve or brain damage in animals eating or drinking it.  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.

---

[9] https://www.usatoday.com/story/news/nation/2016/03/16/what-lead-levels-in-water-mean/81534336/

75.     As used herein, the term "pesticides" refers to a class of chemical or organic substances used to control pests and weeds on cultivated plants. When pesticides are applied to crops, the residue can remain until it has been harvested for consumption or processing. The EPA regulates the amount of pesticides allowed in food, and the tolerance varies depending on the substance at issue. Pesticides have been linked to numerous health problems with animals, such as vomiting, diarrhea, seizures, and death. Moreover, long-term exposure to pesticides has been connected to birth defects, nerve damage, and various cancers.

76.     Acrylamide is a colorless, odorless chemical substance with numerous industrial applications, including treating waste water discharge and the production of paper and other textiles. Acrylamide is found in tobacco smoke and can occur when food is cooked or processed at high temperatures, such as baking, frying, and roasting. The EPA has set limits on the acceptable amount of acrylamide in drinking water. Furthermore, several organizations, including the Department of Health and Human Services, the International Agency for Research on Cancer, and the EPA have concluded that acrylamide is likely to be carcinogenic to humans. Most importantly, acrylamide is known to be carcinogenic in animals.

77.     Finally, BPA, an industrial chemical that is an endocrine disruptor, has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems. The dangers of BPA in human food are recognized by the FDA, as well as by the state of California. For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers with intentionally-added BPA.

78.     Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the inclusion (or risk of inclusion) of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels in the Contaminated Dog Foods a material fact when considering what pet food to purchase.

79.     Despite the known risks of exposure to Heavy Metals, pesticides, acrylamide, and BPA, Defendants negligently, recklessly, and/or knowingly sold the Contaminated Dog

Foods without disclosing they contain Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

80.     In fact, Defendants expressly admit knowledge that Heavy Metals are "potentially dangerous chemicals" "that can cause vomiting, a painful abdomen, bloody diarrhea, even seizures and kidney or liver failure if eaten," and that these are substances "toxic to animals."[10]

81.     Therefore, Defendants knew or should have known that the presence of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels in their Contaminated Dog Foods was material to consumers of the Products.

82.     Additionally, Defendants knew or should have been aware that a consumer would be feeding the Contaminated Dog Foods multiple times each day to his or her dog making it the main, if not only, source of food for the family dog.  This leads to repeated exposure of the Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels the family dog.

83.     Defendants have wrongfully and misleadingly advertised and sold the Contaminated Dog Foods without any label or warning indicating to consumers that the Products contain Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels, or that these toxins can over time accumulate in the dog's body to the point where poisoning, injury, and/or disease can occur.

84.     Defendants' omissions are material, deceptive, misleading, unfair, false, and reasonably likely to deceive the public.

85.     This is true especially in light of Defendants' long-standing Marketing campaign representing the Contaminated Dog Foods as possessing certain qualities pertaining to their

---

[10] TasteoftheWildPetFood.com (June 30, 2016) available at
(https://www.tasteofthewildpetfood.com/pop-pop-kaboom-managing-pets-fireworks-fear/;
(Aug. 4, 2015) available at https://www.tasteofthewildpetfood.com/what-you-need-to-know-to-get-puppies-through-their-first-summer/.

composition and quality in order to induce consumers, such as Plaintiffs, to purchase the Products.

86. The use of such representations, descriptions, and promises makes Defendants' Marketing campaign deceptive based on the presence of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels on the Contaminated Dog Foods.

87. Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are healthy, natural, high quality, undergo rigorous testing, and are free of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

88. Moreover, a reasonable consumer, such as Plaintiffs and other members of the Class, would have no reason to not believe Defendants' statements regarding the quality of the Contaminated Dog Foods. Defendants' nondisclosure and/or concealment of the toxins in the Contaminated Dog Foods coupled with the misrepresentations alleged herein that were intended to and do, in fact, cause consumers, like Plaintiffs and the members of the Classes, to purchase a product they would not have bought if the true quality and ingredients were disclosed or pay a premium for such dog food.

89. As a result of Defendants' wrongful Marketing, which includes misleading, deceptive, unfair, and false statements and omissions, Defendants have generated substantial sales of the Contaminated Dog Foods.

90. Defendants' wrongful Marketing, which includes misleading, deceptive, unfair, and false representations and omissions, allowed it to capitalize on, and reap enormous profits from, consumers who paid the purchase price or a premium for the Products that were not as advertised.

91. This is not surprising given that, for example, natural pet food sales represent over $5.5 billion in the United States and have consistently risen over the years:



**DEFENDANTS' STATEMENTS**
**AND OMISSIONS VIOLATE ILLINOIS LAWS**

92.     Illinois law is designed to ensure that a company's claims about its products are truthful and accurate.

93.     Defendants violated Illinois law by incorrectly claiming through their Marketing and omissions that the Contaminated Dog Foods possessed superior qualities when they did not, based on the presence of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

94.     Defendants' Marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiffs to plead relying upon each advertised misrepresentation.

95.     Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods were superior quality, pure, healthy, natural, and did not contain ingredients known to have potential risks to both human and animal health.  Likewise, Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods were natural, pure, and superior quality despite the presence of BPA in the food.

## PLAINTIFFS' RELIANCE WAS
## REASONABLE AND FORESEEN BY DEFENDANTS

96.     Defendants engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods possessed certain qualities.

97.     Defendants' Marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiffs to plead relying upon each advertised misrepresentation.

98.     When making purchasing decisions, Plaintiffs reasonably relied on Defendants' misleading, deceptive, unfair, and false Marketing.

99.     A reasonable consumer would consider the Marketing of a product when deciding whether to purchase.

100.    Plaintiffs would not have paid the price premium, or would not have purchased at all, Defendants' Contaminated Dog Foods had they been aware of the true nature of Defendants' Products.

## DEFENDANTS' KNOWLEDGE AND NOTICE OF THEIR BREACHES
## OF THEIR EXPRESS AND IMPLIED WARRANTIES

101.    Defendants had sufficient notice of their breaches of express and implied warranties. Defendants have, and had, exclusive knowledge of the physical and chemical make-up of the Contaminated Dog Foods. Moreover, Defendants were put on notice by the Clean Label Project about the inclusion of Heavy Metals, BPA, pesticides, acrylamide, and/or other contaminants or unnatural ingredients in the Contaminated Dog Foods.

102.    Furthermore, Defendants were on notice of the breach by way of the Class Action Lawsuit filed against them on August 28, 2018 in the Eastern District of California[11]. This lawsuit included identical factual allegations as the facts alleged herein.

103.    Finally, Plaintiff Jackson sent a letter directly to Defendants on January 22, 2019 notifying them of the breaches of both their express and implied warranties concerning the

---

[11] *Grossman v. Schell & Kampeter, Inc. et al.*, No.: 2:18-cv-02344, U.S. District Court for the Eastern District of California (Aug. 28, 2018).

Contaminated Dog Foods. On February 8, 2019, Defendants likewise received a letter from Plaintiff Kaszynski notifying them of their breaches of both their express and implied warranties concerning the Contaminated Dog Foods.

### PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASSES

104.     Defendants knew that consumers such as Plaintiffs and the proposed Classes would be the end purchasers of the Contaminated Dog Foods and the target of their Marketing.

105.     Defendants intended their Marketing to be considered by the end purchasers of the Contaminated Dog Foods, including Plaintiffs and the proposed Classes.

106.     Defendants directly marketed to Plaintiffs and the proposed Classes through statements on their website, labeling, advertising, and packaging.

107.     Plaintiffs and the proposed Classes are the intended beneficiaries of the expressed and implied warranties.

### CLASS ACTION ALLEGATIONS

108.     Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, on behalf of the below-defined Classes:

> **National Class**: All persons in the United States who purchased the Contaminated Dog Foods for household or business use, and not for resale.

> **Consumer Fraud Multi-State Class**: All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Contaminated Dog Foods for household or business use, and not for resale.[12]

> **Illinois Class**: All persons in the State of Illinois who purchased the Contaminated Dog Foods for household or business use, and not for resale.

---

[12] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, et seq.); Florida (Fla. Stat. §501.201, et seq.); Illinois (815 Ill. Comp. Stat. 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws §445.901, et seq.); Minnesota (Minn. Stat. §325F.67, et seq.); Missouri (Mo. Rev. Stat. §407.010, et seq.); New Jersey (N.J. Stat. §56:8-1, et seq.); New York (N.Y. Gen. Bus. Law §349, et seq.); and Washington (Wash. Rev. Code §19.86.010, et seq.).

109. Excluded from the Classes are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, coconspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

110. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

111. The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Class members in a single action will provide substantial benefits to the parties and Court.

112. Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a) whether Defendants owed a duty of care to Plaintiffs and members of the Classes;

(b) whether Defendants knew or should have known that the Contaminated Dog Foods contained Heavy Metals;

(c) whether Defendants knew or should have known that the Contaminated Dog Foods contained BPA;

(d) whether Defendants knew or should have known that the Contaminated Dog Foods contained pesticides;

(e) whether Defendants knew or should have known that the Contaminated Dog Foods contained acrylamide;

(f) whether Defendants wrongfully failed to state that the Contaminated Dog Foods contained Heavy Metals;

(g) whether Defendants wrongfully failed to state that the Contaminated Dog Foods contained BPA;

(h)     whether Defendants wrongfully failed to state that the Contaminated Dog Foods contained pesticides;

(i)     whether Defendants wrongfully failed to state that the Contaminated Dog Foods contained acrylamide;

(j)     whether any of Defendants' Marketing is deceptive, misleading, unfair, and/or false individually or as a whole;

(k)     whether Defendants' Marketing is likely to deceive a reasonable consumer;

(l)     whether a reasonable consumer would consider the presence of Heavy Metals as a material fact in purchasing pet food;

(m)     whether a reasonable consumer would consider the presence of acrylamide as a material fact in purchasing pet food

(n)     whether a reasonable consumer would consider the presence of pesticides as a material fact in purchasing pet food;

(o)     whether a reasonable consumer would consider the presence of BPA as a material fact in purchasing pet food;

(p)     whether Defendants knew or should have known their Marketing is deceptive, misleading, unfair, and/or false;

(q)     whether Defendants continue to disseminate their Marketing despite their knowledge that their Marketing is deceptive, misleading, unfair, and/or false;

(r)     whether Defendants' wrongful conduct alleged herein was negligent, reckless, and/or intentional;

(s)     whether a representation that a product does not contain Heavy Metals is material to a reasonable consumer;

(t)     whether a representation that a product does not contain acrylamide is material to a reasonable consumer;

(u)     whether a representation that a product does not contain pesticides is material to a reasonable consumer;

(v)     whether a representation that a product does not contain BPA is material to a reasonable consumer;

(w)     whether Defendants violated Illinois law;

(x)     whether Defendants breached their express warranties;

(y)     whether Defendants breached their implied warranties;

(z)     whether Defendants' actions violate the State consumer fraud statutes invoked below;

(aa)    whether Defendants made negligent, reckless, and false misrepresentations and omissions;

(bb)    whether Plaintiffs and the members of the Classes are entitled to actual, statutory, and punitive damages; and

(cc)    whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

113.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

114.    Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

115.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

116. Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

117. Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Classes.

118. As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I

**Violation Of State Consumer Fraud Acts**
**(On Behalf Of The Multi-State Class)**

119. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

120. The Consumer Fraud Acts of the States in the Multi-State Class[13] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

121. Defendants intended that Plaintiffs and each of the other members of the Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

122. Had the truth been known, Plaintiffs and other Multi-State Class Members would not have purchased Defendants' Contaminated Dog Foods, or would not have paid as much for the Contaminated Dog Foods.

123. As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other members of the Multi-State Class have sustained damages in an amount to be proven at trial.

---

[13] California (Cal. Bus. & Prof. Code §17200, et seq.); Florida (Fla. Stat. §501.201, et seq.); Illinois (815 Ill. Comp. Stat. 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws §445.901, et seq.); Minnesota (Minn. Stat. §325F.67, et seq.); Missouri (Mo. Rev. Stat. §407.010, et seq.); New Jersey (N.J. Stat. §56:8-1, et seq.); New York (N.Y. Gen. Bus. Law §349, et seq.); and Washington (Wash. Rev. Code §19.86.010, et seq.).

124.    In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II

**Violation of the Illinois Consumer Fraud Act**
**(In The Alternative To Count II And On Behalf Of The Illinois Class)**

125.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

126.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.  The ICFA is to be liberally construed to effectuate its purpose.

127.    Defendants' conduct in misrepresenting the benefits of its Contaminated Dog Foods constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendants' trade or commerce.

128.    Defendants' Claims that, among other representations, the Contaminated Dog Foods are composed of superior ingredients, healthy and offer the "best nutrition available today"  that "nature intended" untrue or misleading, as is failing to make any mention of Heavy Metals or acrylamide in the Contaminated Dog Foods.  Likewise, Defendants' statements that, among other representations, the Contaminated Dog Foods are natural, pure, and offer the "best nutrition available today" that "nature intended"  are untrue or misleading, as failing to disclose the presence of BPA or pesticides in the dog food.

129.    Defendants knew, or reasonably should have known, that all these Claims were untrue or misleading.

130.    Defendants intended that Plaintiffs and the Illinois Class Members would rely on their misrepresentations.

131. Defendants' misrepresentations are material because they concern the type of information upon which a reasonable consumer would be expected to rely in making a decision whether to purchase the Contaminated Dog Foods.

132. Because Defendants are in the business of selling dog food products, Defendants committed the unfair and deceptive acts in the conduct of their trade and commerce.

133. Defendants' practice of misrepresenting the Contaminated Dog Foods is also unfair because it offends public policy and is immoral, unethical, and unscrupulous because Illinois consumers are being misled about the very efficacy and purpose of the Contaminated Dog Foods. Misrepresenting the Contaminated Dog Foods offends the public's expectation to be told the truth about the products they are buying. Likewise, Defendants' statements and images that depict that the Contaminated Dog Foods are natural, pure, and offer the "best nutrition available today" that "nature intended" are false and likely to deceive the public.

134. Defendants' conduct causes substantial injury to consumers.

135. Plaintiffs and Illinois Class Members were deceived by the misleading labeling and advertising of the Contaminated Dog Foods and suffered economic damages as a proximate result of Defendants' unlawful conduct as alleged herein, including the difference between the actual value of the Contaminated Dog Foods and the value of the Contaminated Dog Foods if they had been as represented.

136. Had the truth been known, Plaintiffs and other Illinois Class Members would not have purchased Defendants' Contaminated Dog Foods, or would not have paid as much for the Contaminated Dog Foods.

137. Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

138. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase the Products in the future if they can be assured that, so long as the Contaminated Dog Foods are, as advertised, healthy and offer the "best nutrition available today" that "nature intended" and do not contain Heavy

Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels.

139.    Plaintiffs and members of the Class are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Contaminated Dog Foods.

<u>**COUNT III**</u>

**Breach Of Express Warranty**
**(On Behalf Of The National Class)**

140.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    As set forth herein, Defendants made express representations to Plaintiffs and the National Class that, among other representations, the Contaminated Dog Foods are as "nature intended" and formulated "based on your pet's ancestral diet."

142.    Defendants also made express representations to Plaintiffs and the National Class that the Contaminated Dog Foods were composed of superior ingredients, healthy and offer the "best nutrition available today"  that "nature intended."

143.    Defendants likewise made express representations to Plaintiffs and the National Class that the Contaminated Dog Foods are natural and pure.

144.    Prior to filing this suit, Plaintiffs notified Defendants of the breaches of their express warranties.

145.    Plaintiffs, and each member of the National Class, formed a contract with Defendants at the time Plaintiffs and the other members of the National Class purchased the Contaminated Dog Foods.  The terms of the contract included the promises and affirmations of fact made by Defendants on the Products' packaging and the Products' labels which are identically represented on Defendants' website and other retailers' websites, such as Chewy.com and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of

the standardized contract between Plaintiffs and the members of the National Class and Defendants.

146.    Plaintiffs and the members of the National Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Contaminated Dog Foods.

147.    Defendants knowingly breached the express warranties by including Heavy Metals, BPA, pesticides, and/or acrylamide in the Contaminated Dog Foods.

148.    Had they known the true nature of the Contaminated Dog Foods, Plaintiffs and each of the members of the National Class would not have purchased the Contaminated Dog Foods, or would not have paid as much for the Contaminated Dog Foods.

149.    Defendants were on notice of this breach as they were aware of the risk of and/or included Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels in the Contaminated Dog Foods, and based on the public investigation by the Clean Label Project that showed the Products as unhealthy.

150.    Furthermore, Defendants were on notice of the breach by way of the Class Action Lawsuit filed against them on August 28, 2018 in the Eastern District of California. This lawsuit included identical factual allegations as the facts alleged herein.

151.    Privity exists because Defendants expressly warranted to Plaintiffs and the National Class that the Contaminated Dog Foods were healthy, superior quality, natural, and/or pure.

152.    Plaintiffs and the National Class reasonably relied on the express warranties by Defendants.

153.    As a result of Defendants' breaches of their express warranties, Plaintiffs and the National Class sustained damages as they paid money for the Contaminated Dog Foods that were not what Defendants represented.

154.    Plaintiffs, on behalf of themselves and the National Class, seek actual damages for Defendants' breach of express warranty.

## COUNT IV
### Breach of Implied Warranty
### (On Behalf of the National Class)

155.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.     As set forth herein, Defendants made affirmations of fact on the Contaminated Dog Foods' labels to the Class that, among other representations, the Contaminated Dog Foods are as "nature intended" and formulated "based on your pet's ancestral diet."

157.     Defendants also made affirmations of fact on the Contaminated Dog Foods' labels to Plaintiffs and the National Class that, among other representations, the Contaminated Dog Foods were the Contaminated Dog Foods are composed of superior ingredients, healthy and offer the "best nutrition available today"  that "nature intended" and did not contain Heavy Metals or acrylamide.

158.     The Contaminated Dog Foods did not conform to these affirmations and promises as they contained Heavy Metals and/or acrylamide at alarming and unsafe levels.

159.     Defendants also made affirmations of fact on the Contaminated Dog Foods' labels to Plaintiffs and the Class that Contaminated Dog Foods were natural dog food are composed of superior ingredients and offer the "best nutrition available today"  that "nature intended" and did not contain BPA or pesticides.

160.     The Contaminated Dog Foods did not conform to these affirmations and promises as they contain BPA and/or pesticides.

161.     Prior to filing this suit, Plaintiffs notified Defendants of the breaches of their implied warranties.

162.     These promises became part of the basis of the bargain between the parties and thus constituted implied warranties.

163.     Defendants are merchants engaging in the sale of goods to Plaintiffs and the members of the National Class.

164. There was a sale of goods from Defendants to Plaintiffs and the members of the National Class.

165. Defendants breached the implied warranties by selling the Contaminated Dog Foods that failed to conform to the promises or affirmations of fact made on the container or label as each product contained Heavy Metals, BPA, pesticides, and/or acrylamide.

166. Defendants were on notice of this breach as they were aware of the Heavy Metals, BPA, pesticides, and/or acrylamide included in the Contaminated Dog Foods, and based on the public investigation by the Clean Label Project that showed the Products as unhealthy.

167. Furthermore, Defendants were on notice of the breach by way of the Class Action Lawsuit filed against them on August 28, 2018 in the Eastern District of California. This lawsuit included identical factual allegations as the facts alleged herein.

168. Privity exists because Defendants impliedly warranted to Plaintiffs and the National Class through the warranting, packaging, advertising, marketing, and labeling that the Contaminated Dog Foods were pure, healthy, natural, offer the "best nutrition available today" that "nature intended" and by failing to make any mention of the Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels. .

169. As a result of Defendants' breaches of their implied warranties of merchantability, Plaintiffs and the National Class sustained damages as they paid money for the Contaminated Dog Foods that were not what Defendants represented.

170. Plaintiffs, on behalf of themselves and the National Class, seek actual damages for Defendants' breach of implied warranty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for judgment against the Defendants as to each and every Count, including:

A. An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class(es), and requiring Defendants to bear the costs of class notice;

B.      An order enjoining Defendants from selling the Contaminated Dog Foods until the inclusion and or risk of inclusion of Heavy Metals, pesticides, acrylamide, BPA, and/or unnatural or other ingredients that do not conform to the labels are removed or disclosed to consumers;

C.      An order enjoining Defendants from selling the Contaminated Dog Foods in any manner suggesting or implying that they are healthy, natural, and offer the "best nutrition available today" that "nature intended;"

D.      An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing Products;

E.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.      An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the State consumer fraud statutes invoked in this Complaint, plus pre- and post-judgment interest thereon;

G.      An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.      An order requiring Defendants to pay all actual and statutory damages permitted under the Count alleged herein, including under the State consumer fraud statutes invoked in this Complaint, in an amount to be determined by this Court but at least $5,000,000;

I.      An order requiring Defendants to pay punitive damages on any cause of action so allowable, including under the State consumer fraud statutes invoked in this Complaint;

J.      An order awarding attorneys' fees and costs to Plaintiffs, and the Class(es); and

K.      An order providing for all other such equitable relief as may be just and proper, including under the State consumer fraud statutes invoked in this Complaint.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 28, 2019

Respectfully Submitted:

**LITE DEPALMA GREENBERG LLC**

*/s/ Katrina Carroll*
Katrina Carroll
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: kcarroll@litedepalma.com

**LITE DEPALMA GREENBERG LLC**
Susana Cruz Hodge
570 Broad Street – Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
E-mail: scruzhodge@litedepalma.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert K. Shelquist
Rebecca A. Peterson
100 South Washington Ave., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
rapeterson@locklaw.com

**KOHN, SWIFT & GRAF, P.C.**
Jonathan Shub
Kevin Laukaitis
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
E-mail: jshub@kohnswift.com
klaukaitis@kohnswift.com

**ROBBINS ARROYO LLP**
Kevin A. Seely

Steven M. Mckany (271405)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com
smckany@robbinsarroyo.com

**GUSTAFSON GLUEK, PLLC**
Daniel E. Gustafson
Karla M. Gluek
Joseph C. Bourne
Raina C. Borrelli
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
jbourne@gustafsongluek.com
rborrelli@gustafsongluek.com

*Attorneys for Plaintiffs and the Class*